**Denise MADSEN, Plaintiff,**

v.

**WYOMING RIVER TRIPS, INC.,
a Wyoming corporation,
Defendant,**

v.

**Bruce Madsen, Counterclaim Defendant.**

No. 98–CV–116–B.

United States District Court,
D. Wyoming.

Jan. 4, 1999.

**1322**

Terry W. Mackey, Cheyenne, WY, for Plaintiff.

Eric Peterson, Marty Barnett, White & Steele, P.C., Denver, CO, for Defendant.

Terry W. Mackey, Cheyenne, WY, for Counterclaim Defendant.

### *ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

BRIMMER, District Judge.

This case surrounds an accident on a river rafting trip. The plaintiff, along with her husband, Bruce Madsen, and two daughters attended the trip. Before embarking on the trip, Bruce Madsen signed a "Reservation and Liability Release." Defendant claims that this release requires Bruce Madsen to indemnify Defendant for any claims brought by a member of his family against the defendant. Defendant also argues that the Wyoming Recreational Safety Act precludes this lawsuit because Plaintiff was injured due to an "inherent risk" in river rafting: being jostled in a river raft and bumping heads. Plaintiff argues that she was not injured from an inherent risk, but rather from the defendant's negligence when it overloaded the river raft. Having heard oral argument and being fully advised of the premises, the Court **FINDS** and **ORDERS:**

## Background

On August 1, 1996, Mr. and Mrs. Madsen, along with their two daughters, prepared for a river-rafting trip on the Shoshone River in northeastern Wyoming. Prior to embarking on the raft trip, Mr. Madsen signed the following "Reservations and Liability Release:"

I, *on behalf of my minor children*, acknowledge that white water rafting is a potentially hazardous activity and that there is a possibility of personal injury to me and my minor children by participating in white water rafting.

In consideration for *me, and my minor children*, being allowed to participate in the white water rafting trip with WYOMING RIVER TRIPS, I hereby personally assume for *myself and my minor children* all risks in connection with the white water river trip, and I freely and voluntarily release and irrevocably discharge WYOMING RIVER TRIPS, its owners, employees, and agents from any and all legal claims or legal liability of any kind, and nature and description, including any claim for negligence, arising from any injury or damage which might befall *me or my minor children* as a participant in a white water river trip with WYOMING RIVER TRIPS, including all risk connected therewith whether foreseen or unforeseen, and *I further agree to save and hold harmless WYOMING RIVER TRIPS, its owners, employees an agents,* **from any claim by me or my family, estate, heirs, or assigns.**

SIGNATURE OF PARTICIPANT

**1.** Two prefatory matters must be addressed. First, Plaintiff initially moved to strike Defendant's Eighth Affirmative Defense: That Plaintiff's claims are barred as a result of their having signed a written release of liability prior to embarking on the trip. As mentioned earlier, only Bruce Madsen signed the release. At the time this motion was filed, Bruce Madsen was also a plaintiff. Since that time, Bruce Madsen's claims were dismissed upon stipulation. Accordingly, Defendant has conceded that this defense *is no longer relevant.* The Court agrees, and Defendant's Eighth Affirmative defense is hereby **STRICKEN.**

Additionally, at oral argument it appeared as though counsel were confused as to whether this

*individual and/or as parent of minor children*

(emphasis added).

The guide, an employee of the defendant, took the Madsens and others on the trip. The guide placed the Madsen's two daughters in the front of the raft, where there were no seats. Mrs. Madsen protested how her daughters were seated because she thought it was dangerous. (Denise Madsen Dep. at 158–62.) Mrs. Madsen's daughters were seated facing towards the back of the raft, while Mrs. Madsen faced forward sitting in a seat. *Id.* Mrs. Madsen was injured when she and her daughter struck heads while traveling through the last rapid of the trip.

Mrs. Madsen then brought this lawsuit alleging that Defendant's negligence caused her injuries. Defendant has counterclaimed against Bruce Madsen, claiming he is obligated to indemnify Wyoming River Trips for any lawsuit brought by a member of his family.

## Analysis

### I. Plaintiff's Motion to Dismiss[1]

Plaintiff has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Court treats motions for judgment on the pleadings under the same analysis that is applicable to a Rule 12(b)(6) motion to dismiss. *See McHenry v. Utah Valley Hosp.*, 927 F.2d 1125, 1126 (10th Cir.1991). Therefore, Plaintiff must prove that Defendant can prove no set of facts upon which relief can be granted. *See Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir.1994).[2]

was a motion for judgment on the pleadings or one for summary judgment. On September 28, 1998, Defendant moved for an extension of time to respond to Plaintiff's motion to dismiss/strike. He also moved in that motion to convert Plaintiff's motion to one for summary judgment. In an order dated October 15, 1998, Magistrate Judge Beaman granted Defendant's motion for an extension of time to respond. However, Magistrate Judge Beaman did not, and could not, convert this dispositive motion to one for summary judgment. Therefore, the motion remains one for judgment on the pleadings.

**2.** The Court may consider the "Reservations and Liability Release" because it is an integral part of the defendant's counterclaim.

In its answer, Defendant counterclaimed against Bruce Madsen, claiming that he was obligated to indemnify the defendant for any claim made by his family. The defendant made this argument based on the "Reservations and Liability Release" that Bruce Madsen signed. In the last sentence, the Release effectively stated that Mr. Madsen would hold Defendant harmless from any legal claim brought by his family.

The parties have devoted most of their briefs to discussing the qualifications for valid exculpatory agreements. But unlike those cases—where the issue was releasing the defendant from liability—this situation is unique because Defendant is seeking to invoke an indemnity clause. Thus, the case law devoted to release agreements is largely irrelevant. Instead, the Court must use the rules of contract interpretation and the well established principles used when interpreting indemnification agreements to decide whether the agreement is valid.

■ The parties do not disagree as to the facts surrounding the signing of the document. Plaintiff admits that Mr. Madsen signed it. But they disagree as to the meaning of the document. Interpretation and construction of a contract are matters of law for a court to decide. *See Schutkowski v. Carey*, 725 P.2d 1057, 1059 (Wyo.1986) (citation omitted). Accordingly, the question of whether the indemnification clause is enforceable is properly before the Court on this motion. *See id.*

■ In this case, Defendant seeks to invoke a type of indemnity agreement that is disfavored by the courts. Here, Defendant seeks to hold Mr. Madsen (the indemnitor) liable for the alleged negligence of Wyoming River Trips (the indemnitee). Contracts for indemnity are strictly construed against the indemnitee. *See Wyoming Johnson, Inc. v. Stag Industries, Inc.*, 662 P.2d 96, 99 (Wyo. 1983). This is especially true when the indemnitee seeks to hold the indemnitor liable for its own negligence. *See id.* "Mere general, broad, and seemingly all-inclusive language in the indemnifying agreement has been said not to be sufficient to impose liability for the indemnitee's own negligence." *Id.*

Normally, indemnity contracts are enforced where the indemnitor is assuming liability for an act that was no fault of the indemnitee. For example, such a situation exists when a contractor is assuming the liability of a land owner for a lawsuit resulting from a subcontractor's negligence. But this situation is like no other indemnity agreement the Court has unearthed in its research: An attempt to hold a private consumer responsible for claims made by his own family that were brought due to a business's alleged negligence.

■ When the Court views the "Reservations and Liability Release" as a whole, it must construe the indemnification provision against Wyoming River Trips. The relevant language in the document states: "and I further agree to save and hold harmless WYOMING RIVER TRIPS, its owners, employees and agents, from any claim by me or my family, estate, heirs or assigns." But this indemnification provision was buried at the end of a run-on sentence (in very small print) in which the entire focus of the sentence was that Mr. Madsen was only signing on behalf of he and his minor children. Several times the agreement states that Mr. Madsen is signing on behalf of himself and his minor children. It is only in the very last clause that the defendant changes its terms and uses "family" in lieu of "myself and my minor children." Moreover, on the signature line Mr. Madsen is purportedly only signing on behalf of him and his minor children.

When one reads the document as a whole, the logical conclusion is that "family" applies only to Mr. Madsen and his minor children, and does not apply to Mrs. Madsen. Alternatively, the most likely intent of the parties was to prevent a suit by a signator's family member for wrongful death if the signator happened to be killed on a trip. One thing is certain, the plain language of the document does not convey an intent to prevent a suit by Mrs. Madsen. If Defendant wanted to prevent such an action, it could have easily had Mrs. Madsen sign the document. Any other result would defy the policy behind these indemnity agreements—that they must be strictly construed against the indemnitee. The equities are harshly against Defendant's position, especially when the agreement is trying to hold an innocent party, Mr. Mad-

sen, liable for Wyoming River Trips' alleged negligence.

█ Even if the Court accepted Defendant's interpretation of the document, the Court finds that the indemnification clause is unenforceable as void against public policy. The modern trend is to not enforce indemnity agreements of this type (where the indemnitee holds an innocent party liable for its own negligence) on public policy grounds. *See Petraglia v. Benincasa Const., Inc.,* 1997 WL 536333, at *1 (Conn.Super.Ct. Aug.18, 1997) (citing cases that support the public policy rationale). Defendant's unprecedented attempt to hold a private citizen to an indemnity contract for a service that he himself purchased will not stand.

While the Wyoming Supreme Court has found that indemnity contracts are enforceable in commercial contexts, it has never held that such contracts were enforceable in a consumer services context such as this. Indeed, the Wyoming Supreme Court has recognized that the "modern trend concerning the right to indemnity is to look to principles of equity." *Schneider Nat'l, Inc. v. Holland Hitch Co.,* 843 P.2d 561, 572 (Wyo.1992). This case involves a situation where a consumer, Mr. Madsen, was purchasing services from a member of the business community, Wyoming River Trips. This purchase involved skill of a specialized nature, namely taking one white-water rafting. Mr. Madsen had to put his trust in the defendant. The release does not advise Mr. Madsen of the specific risks inherent in river rafting, or the dangers involved. An indemnitor should know these things before he agrees to indemnify the service provider. Mr. Madsen was not negligent, he was merely an innocent passenger in the boat. It would be unjust to hold a passive individual liable, especially a consumer, for the negligence of business entity. In sum, this case is in stark contrast to previous cases where indemnity agreements were upheld.

Accordingly, Plaintiff's motion for judgment on the pleadings as to Defendant's counterclaim against Mr. Madsen is **GRANTED.** Defendant's claim is **DISMISSED WITH PREJUDICE.**

## II. Defendant's Motion for Summary Judgment

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Craig v. Eberly,* 164 F.3d 490, 491 (10th Cir.1998) (quoting Fed. R.Civ.P. 56(c)). The Court will view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *See id.* (citation omitted).

Although the movant must show the absence of a genuine issue of material fact, he or she need not negate the nonmovant's claim. *See, e.g., Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir.1996). "Once the movant carries this burden, the nonmovant cannot rest upon his or her pleadings, but 'must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [she] carries the burden of proof.'" *Craig,* at 491 (quoting *Jenkins,* 81 F.3d at 990). Given these standards, the Court turns to Defendant's motion for summary judgment.

The Wyoming Recreational Safety Act (the "Act") provides:

(a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

(b) A provider of any sport or recreational activity, is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

(c) Actions based upon negligence of the provider wherein the damage, injury or death is not of an inherent risk of the sport or recreational opportunity shall be preserved to W.S. 1–1–109.

Wyo.Stat.Ann. § 1–1–123 (Michie 1998). Inherent risk is defined as:

(1) "Inherent risk" with regard to any sport or recreational opportunity means those conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity;

Wyo.Stat.Ann. § 1–1–122 (Michie 1998).

Prior to 1996, the legislature defined inherent as "any risk that is characteristic of or intrinsic to any sport or recreational opportunity *and which cannot reasonably be eliminated, altered, or controlled.*" The Wyoming Supreme Court interpreted the Act prior to the amendment in *Halpern v. Wheeldon.* 890 P.2d 562 (Wyo.1995).

In *Halpern,* the plaintiff, a guest on a ranch, sued for injuries he sustained when the horse he was attempting to mount bucked and threw him to the ground. *See id.* at 564. The district court granted summary judgment, finding that being thrown from a horse was intrinsic to the sport of horseback riding. *See id.* at 565. The Wyoming Supreme Court reversed, finding that a genuine issue of material fact existed as to whether the risks encountered by the plaintiff were intrinsic to the sport of horseback riding and whether the defendant could have "reasonably altered, eliminated, or controlled those risks." *See id.* at 566.

The *Halpern* court correctly distinguished between primary and secondary assumption of risk. *See* Catherine Hansen–Stamp, *Recreational Injuries and Inherent Risks: Wyoming's Recreational Safety Act—An Update,* 33 Land & Water L.Rev. 249 (1998) [hereinafter Hansen–Stamp, *Inherent Risks* ]. Secondary assumption of risk has traditionally been considered an absolute defense to breach of duty. *See id.* It is akin to contributory negligence, and has thus been abrogated as a valid legal doctrine in Wyoming due to the enactment of the comparative negligence statute. *See Halpern,* 890 P.2d at 565. On the other hand, under primary assumption of risk "there is no liability to the plaintiff because there is no negligence on the part of the defendant to begin with; the danger is one which defendant is not required to extinguish or warn about; having no duty to begin with, there is no breach of duty to constitute negligence." Hansen–Stamp, *Inherent Risks, supra; see also Halpern,* 890 P.2d at 565.

■ The *Halpern* court found that the Act was akin to primary assumption of risk.[3] Thus, the question under the "inherent risk" analysis is one of duty. *See Halpern,* 890 P.2d at 565. Generally, the question of duty is one of law for the court, but in certain instances, the duty issue involves questions of fact. *See id.* The *Halpern* court found that under the Act, whether a risk was "inherent" or could "reasonably be eliminated" was a question of fact for the jury. *See id.* The Wyoming Supreme Court conceded, however, that there will be instances when the duty question could be decided as a matter of law; only when material issues of fact are in dispute does the duty analysis under the Act become a factual one. *See id.*

The Wyoming legislature responded to *Halpern.* It eliminated the second inquiry of inherent risk: Whether the risk reasonably could be eliminated. The legislature's intent behind this move was to encourage the Courts to dismiss ˙cases involving inherent risks. *See* Hansen–Stamp, *Inherent Risks, supra.* Indeed, under the revised Act, it is specifically stated that providers have no duty to eliminate, alter or control the inherent risks within a particular sport.

In *Cooperman v. David,* Judge Downes analyzed the effect of the 1996 amendments on the inherent risk analysis. 23 F.Supp.2d 1315 (D.Wyo.1998). First, Judge Downes found that despite the removal of the "reasonably could be eliminated" inquiry, the question of inherent risk was still one for the jury. *See id.* at 1317. As Judge Downes noted, the *Halpern* court favorably cited *Dillworth v. Gambardella,* 970 F.2d 1113 (2d

---

**3.** The defendant has also argued for summary judgment on the common law theory of the primary assumption of risk. Defendant argued that *Halpern* implicitly recognized litigants could proceed upon this doctrine independent of the Act. The Court rejects this argument. As Hansen–Stamp recognized in her article, the Wyoming legislature essentially codified the primary assumption of risk doctrine when it enacted the Act. The Wyoming legislature, recognizing that the courts continued to confuse primary and secondary assumption of risk, passed the Act. *See* Hansen–Stamp, *Inherent Risks, supra* ("Importantly, in codifying the inherent (primary assumption of risk) doctrine, the Act ... ").

Cir.1992). There the Second Circuit, while analyzing a Vermont Act similar to Wyoming's, put it simply:

> To say that inherent risks are assumed by the sports participants "as a matter of law" is of little solace to defendants when the question remains: what risks in a sport are inherent, obvious or necessary to its participation, a question that ordinarily must be resolved by the jury.

*Id.* at 1119. The Court agrees with Judge Downes' analysis that the duty question is still ordinarily one for the jury; that is, the approach adopted in *Halpern* remains a valid framework to analyze inherent risk (save the second inquiry that was eliminated by the legislature). *See Cooperman,* 23 F.Supp.2d at 1317.

Thus, the next question is "what is an inherent risk?" Hansen–Stamp's article is instructive. By analyzing the relevant case law, she found that inherent risks are "1) those risks which are essential characteristics of a sport and those which participants desire to confront; ... and 2) those undesirable risks which are simply collateral to the recreational activity." Hansen–Stamp, *Inherent Risks, supra;* see also *Cooperman,* 23 F.Supp.2d at 1318; *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1047 (Utah 1991).

Given this standard, Judge Downes denied summary judgment on nearly identical circumstances to those before the Court today.[4] In *Cooperman,* the plaintiff fell off of a horse when his saddle slipped. *See id.* at 1316. Judge Downes found that a genuine issue of material fact existed as to whether injuring oneself when a saddle slipped was "intrinsic" to horseback riding. *See id.* at 1318. The arguments of counsel went to what the recreational provider did or did not do. *See id.* But Judge Downes reasoned that:

4. Judge Downes granted summary judgment for the defendant on reconsideration. On reconsideration, the defendant came forth with admissible summary judgment evidence which showed that a saddle slipping was an integral part of the sport of horseback riding.

5. Ironically, upon the conclusion of oral argument, the Court offered Defendant the chance to submit admissible evidence as to how being jostled in a river raft was integral to the sport of river rafting. But Defendant was so confident in its position that he denied the Court's offer.

To base an analysis of inherent risk upon the action of the provider, puts the cart before the horse. Such an analysis amounts to a determination of negligence before the determination of duty. That is not to say that the underlying causes of the risk should be completely ignored in all cases. Whether a slipping saddle was caused by a loose cinch, by an equipment malfunction or by the sabotage of an evil minded third-party may well influence whether the jury considers the risk integral to or characteristic of the activity.

*Id.* Accordingly, determining the *adequacy* of the recreational provider's actions is irrelevant for determining the "character" of the risk. *See id.* (emphasis added).

Judge Downes eventually denied summary judgment because the defendant failed to produce admissible evidence that a slipping saddle was an inherent risk of horseback riding. *See id.* The defendant argued that saddles were affixed to horses, and horses move under them, thus it was logical that saddles are bound to slip during horseback riding. *See id.* Judge Downes reasoned that while this may be logical, "the argument of counsel alone cannot form competent evidence for purposes of summary judgment." *Id.*

■ Defendant's motion fails in this case for the same reasons. Defendant has only *argued* that Plaintiff was subject to an inherent risk. But it has produced no admissible evidence going to that fact.[5] As such, it has failed to carry its burden on summary judgment. *See Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1025 (10th Cir. 1992). Accordingly, Defendant's motion must be denied.

Defendant merely cited a case, *Ferrari v. Grand Canyon Dories,* 32 Cal.App.4th 248, 38 Cal. Rptr.2d 65 (1995), for the proposition that bumping heads is integral to the sport of river-rafting. But in that case, the plaintiff had acknowledged by deposition (admissible evidence on summary judgment) that being thrown about the raft was an inherent risk. In any event, California appellate decisions are not binding precedent on this Court. The Court respectfully disagrees with the *Ferrari* panel to the extent it found that being thrown about in a raft was an inherent risk without strong evidence.

Although the Court's denial of summary judgment needs no further explanation, the Court feels compelled to elaborate upon the inherent risk concept so that the parties will not be confused upon trial. The question for the jury is one of duty. There is no duty if Plaintiff was injured by an inherent risk. Defendant argued on summary judgment that placing children in the front of the boat, where there were no seats, was at most an exaggeration of the inherent risk of being jostled in a river raft. Thus, Defendant argues per the Act, there was no duty to control or otherwise eliminate that inherent risk. According to Judge Downes analysis in *Cooperman*, Defendant's argument is meritorious. The Court, however, respectfully disagrees with Judge Downes definition of inherent risk.

The Court understands Judge Downes' analysis of inherent risk to consider only one thing: The abstract character of the risk. Thus, under Judge Downes' analysis, the Court never looks to the defendant's actions to determine whether there is a duty. In other words, the duty question to Judge Downes is not a fact specific inquiry. Instead, actions of the Defendant are only used to determine whether that abstract risk, e.g., a slipping saddle, is an inherent one.

In *Cooperman*, Judge Downes found that it was not relevant whether the defendant forgot to cinch the saddle tight so as to prevent it from slipping. *See* 23 F.Supp.2d at 1318. In other words, the relevant inquiry was only whether a slipping saddle was an inherent risk. If this was so, the inherent risk inquiry ends. *See id.* If the defendant, for instance, forgot to cinch the saddle, this would simply be an exaggeration of an inherent risk. *See id.* But when one takes the *Cooperman* analysis to its logical extreme, this Court must conclude that the Wyoming legislature could not have intended this result unless the specific facts presented in *Cooperman* compelled finding that the risk was inherent.[6]

■ Under the *Cooperman* analysis, for example, an inherent risk of horseback riding (assuming proper proof) would be getting bucked from a horse. An exaggeration of this same inherent risk would be putting three people on the horse simultaneously and being bucked off. The Court disagrees with this logic. Under the Act, the legislature distinguished between inherent risks and negligence of the provider. This is an important difference. A cause of action still exists for negligence of the provider under the Act. *See Walters v. Grand Teton Crest Outfitters,* 804 F.Supp. 1442, 1445 (D.Wyo.1992). The intent behind the Act was not to preclude parties from suing for a provider's negligence, it was merely to stop people from suing providers for those risks that were inherent to a sport.

■ For instance, as Hansen–Stamp analyzed in her article, inherent risks to skiing included, moguls, steep grades, fresh powder, falling rock, and severe and sudden weather changes. From this example, one can see that putting three people on a horse simultaneously would be fundamentally at odds with the definition of inherent risk. Instead, getting bucked off of a horse, in certain situations, may be an inherent risk to horseback riding. But under Judge Downes' analysis, the duty inquiry is not fact specific. The Court believes that one must look to the specific facts of a case to see whether there is a duty, and not simply look to the abstract character of the risk. Thus, the duty question is best resolved by framing the question correctly. Whether a duty exists in the three person example is determined by asking: "Is being bucked from a horse, while three people are riding it, an inherent risk?" The question is not simply: "Is being bucked from a horse an inherent risk?" The latter question wholly ignores the factual circum-

---

**6.** Indeed, language from the *Halpern* decision supports the Court's conclusion on this issue. In *Halpern,* the plaintiff was thrown to the ground by a bucking horse. *See* 890 P.2d at 564. The district court granted summary judgment, finding that being bucked from a horse was an inherent risk to horseback riding. *See id.* In reversing the grant of summary judgment, the Wyoming Supreme Court also framed the duty as

fact specific. It found that a genuine issue of material fact existed as to whether the risks the plaintiff encountered were intrinsic to the sport of horseback riding. *See id.* at 565. It could have framed the inquiry as whether being thrown from a horse was instrinsic. But it did not. Instead, it framed the issue as whether the plaintiff was faced with an instrinic risk in his specific facts, and not in the abstract.

stances surrounding the case when determining whether a duty exists. The latter inquiry also ignores the legislature's command that causes of action still exist for a provider's negligence. As such, in the Court's example, it was likely the defendant's negligence that caused the horse to buck, and not the normal inherent risk of getting bucked while one person rides on a horse.

Likewise, Wyoming River Trips should not try to argue at trial that putting people in the front of the boat is simply an exaggeration of the inherent risk of getting jostled while riding in river rapids. This ignores the factual circumstances around the duty inquiry. Instead, the proper inquiry is whether being jostled around and bumping heads while people are in the front of the boat (and not in seats) is an inherent risk of river rafting. If the answer is yes, Defendant owed Plaintiff no duty. But the plaintiff may try to argue that she was injured not from the normal inherent risk of being jostled (assuming such an inherent risk does exist) but instead was injured due to the defendant's negligence in overloading the boat. As one can see, overloading a boat would not be an exaggeration of an inherent risk (assuming it is unusual and dangerous to do so). Rather, being injured from overloading the boat is a different risk altogether. The Court cannot stress how important it is to frame the duty question correctly. If the duty question is framed incorrectly, the legislature's intent to allow a cause of action for negligence will be lost.

For the foregoing reasons, Defendant's motion for summary judgment is **DENIED**.

### Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings as to Defendant's counterclaim and motion to strike Defendant's Eighth Affirmative Defense are **GRANTED**. Defendant's counterclaim is thus **DISMISSED WITH PREJUDICE** and Bruce Madsen is **DISMISSED AS A PARTY FROM THIS LAWSUIT**. Further, Defendant's motion for summary judgment is **DENIED**.